[No. D013997. Fourth Dist., Div. One. Feb. 26, 1992.]

In re JEREMY W., a Person Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY DEPARTMENT OF SOCIAL SERVICES,
Plaintiff and Respondent, v.
DEANNA O., Defendant and Appellant.

**COUNSEL**

Barbara A. Smith for Defendant and Appellant.

Lloyd M. Harmon, Jr., County Counsel, Susan Strom, Chief Deputy County Counsel and James H. Wellman, Deputy County Counsel, for Plaintiff and Respondent.

J. Michael Crofts for Minor.

**OPINION**

**WORK, Acting P. J.**—Deanna O. appeals a judgment[1] terminating her parental rights to her son, Jeremy, pursuant to Welfare and Institutions Code[2] section 366.26 entered after her petition to modify or set aside an earlier order terminating reunification services had been summarily denied without affording her a hearing. She contends the court abused its discretion by denying her section 388 motion to modify its order terminating reunification proceedings without conducting a hearing to evaluate her claim of changed circumstances; there was insufficient evidence to support a termination of parental rights; and the termination of her parental rights violated the guarantee of due process granted by the Fifth Amendment of the United States Constitution. As we shall explain, we conclude Deanna established her entitlement to a full section 388 hearing through declarations submitted in support of her petition and therefore reverse the judgment and remand with instructions to conduct a full section 388 hearing.

---

[1]As requested, we take judicial notice of the previous record on appeal (No. D012903). That appeal was dismissed. (See *post*, fn. 8.) Some information used in this opinion may be from references in the first appeal.

[2]All statutory references are to the Welfare and Institutions Code unless otherwise specified.

## Factual and Procedural Background

Jeremy was born September 3, 1985, to Deanna, who has a history of emotional, violent outbursts and attempted suicides.[3] During Jeremy's first five years he was cared for by his aunts and grandmother for approximately half of the time when Deanna was unable or unwilling to care for him.

On February 14, 1989, Deanna became upset when her live-in boyfriend's two-year-old daughter did not adequately clean her bedroom, and began to shake the child violently. When the boyfriend tried to intervene, Deanna ran from their home. She voluntarily entered Halcyon, a halfway home for the emotionally disturbed. Four months before, she had slapped the girl so hard as to blacken her eye. She explained, "I really have trouble with 2-year-olds."

Deanna left Jeremy with her boyfriend who placed him with his maternal grandmother, Dorothy, who cared for him until March 6, 1989, when she placed him with the department of social services (Department).

When interviewed by a social worker for the Department on March 7, Jeremy, then three and a half years old, was minimally verbal and spoke with a speech impediment. When asked about his mother, he replied, "She's dead." At that time Deanna told the social worker she was "under too much stress," needed to work on "dealing with problems in a different manner," and had "emotional problems, mostly depression" for which she took prescribed psychotropic medication. She also admitted using crystal methamphetamine sporadically since 1982, including an occasion two weeks before the interview.

Deanna has an older child, Amanda who, by the age of five weeks had sustained mental and physical damage because of nonaccidental head trauma, probably from being shaken by one of her parents. Deanna maintains the injury came about by the father playfully holding the daughter upside down. Amanda came into the custody of the Department in July 1983 under a section 300, subdivision (d) petition[4] because of the injury. The Department provided consistent case management from July 1, 1983, through August 5, 1985, but the services were not effective in preventing the need for

---

[3]Deanna told a social worker about her suicide attempts. "I tried to kill myself in the car, and I slit my wrists." On October 13, 1988, she was admitted to the emergency room at Kaiser Hospital after taking an overdose of Haldol, an antidepressant. The next year, on October 20, 1989, she voluntarily checked into Mesa Vista Psychiatric Hospital at the insistence of one of her therapists, Geoffrey Biggs, because of her suicidal ideation.

[4]The then-applicable section 300, subdivision (d) stated a child comes under the jurisdiction of the juvenile court if the child's home "is an unfit place for him by reason of neglect,

Amanda's removal from Deanna's custody. Now eight years old, she has lived with her court-appointed guardians, Debbie and Michael, since September 9, 1985, when formal guardianship was awarded. Debbie is Deanna's sister, and according to her, Deanna visits Amanda only occasionally. As a result of her brain injury, Amanda functions at the level of a two-year-old.

The Department received a referral on January 21, 1987, alleging Deanna currently had emotional problems and appeared drugged, and Jeremy was seen eating out of a trash can because Deanna failed to feed him. A dependency diversion contract was signed November 10, 1987, leaving Jeremy with Deanna providing she continue to receive counseling she commenced after Amanda was brought to the Department's attention.

A March 29, 1989,[5] petition alleged Jeremy fell within the provisions of section 300, subdivision (b).[6] Count I alleged that Deanna had used methamphetamine to excess, and Jeremy's father was unable to protect him. Count II, which was later stricken, alleged Deanna had chronic emotional problems and showed depression and borderline characteristics. On June 7, Deanna pleaded no contest to the petition after count II was dropped.

On August 24, the trial court removed Jeremy from Deanna's physical custody and a reunification plan was established which permitted regularly scheduled visitations and required parenting education, psychological therapy, abstinence from narcotics and alcohol, drug testing, attendance at substance abuse support groups, and the procurement and maintenance of clean and stable housing for Deanna and Jeremy separate from her boyfriend, Dan.

At first, Deanna had difficulty complying with some aspects of the reunification plan. The first month, visits with Jeremy were initially sporadic. However, when Jeremy was placed in a foster home in Ramona, visits

---

cruelty, depravity, or physical abuse of either of his parents, or of his guardian or other person in whose custody or care he is."

[5]Effective January 1, 1989, the language of section 300, subdivision (a) was substantially changed. New Welfare and Institutions Code provisions were enacted that are to be applied to children declared dependent after January 1, 1989. Civil Code section 232, which used to control these proceedings, no longer does. Because Jeremy's dependency was instituted in March 1989, his case is governed solely by applicable sections in the Welfare and Institutions Code. (See 73 West's Annot. Welf. & Inst. Code (1992 pocket pt.) § 366.26, p. 105.)

[6]Section 300, subdivision (b) states a minor comes within the jurisdiction of the juvenile court if "[t]he minor has suffered, or there is a substantial risk that the minor will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the minor, . . . or by the willful or negligent failure of the parent . . . to provide the minor with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent . . . to provide regular care for the minor due to the parent's . . . mental illness, developmental disability, or substance abuse."

continued and improved. Deanna and Jeremy had their first overnight visit on November 28, 1989. At this time, the social worker expressed concern about Jeremy's speech problems and learning disabilities, and the continued contacts between Deanna and Dan.[7]

At a hearing on February 14, 1990, the court found reasonable services had been provided to Deanna, ordered them continued and granted the social worker discretion in scheduling visitations. They had their first four-day visit from March 5 through March 8, 1990. During the visit, Deanna fought with Dan, who was not supposed to be in the house. A crying Deanna spent most of the visit overwhelmed and depressed, lying on the couch. However, the foster parent stated Jeremy showed no ill effects when he returned from this visit, appearing happy and normal.

The 12-month review hearing was held August 6-7, 1990. From March through the hearing date, Deanna had trouble maintaining stable housing. At one point, she lived with a man in an area known to have drug and gang problems. Later, she lived with various friends or in her car. Jeremy's court-appointed attorney suggested Jeremy be allowed to live with his other maternal aunt and uncle, Denita and Barry, in Texas. On July 7, Jeremy had told the social worker that he wanted to live with his aunt and uncle in Texas because his mother could not "take good care of me." However, he stated his belief Deanna would be able to reside with him also.

At the 12-month hearing, the court terminated reunification services after finding no likelihood of reunification within the next six months.[8] It then ordered Jeremy placed with Denita and Barry in Texas, and set a section 366.26 hearing (to determine adoptability and sever Deanna's parental rights) for December 5, 1990. That hearing date was vacated and the hearing was held on January 7, 1991.

On December 27, 1990, Deanna petitioned under section 388 requesting the order setting the section 366.26 hearing date be modified or set aside. This request was denied summarily without hearing on January 4, 1991, three days before the scheduled section 366.26 hearing.

---

[7]Dan's two children were under the control of the Department as of April 21, 1989, due to allegations of his repeated methamphetamine abuse and gambling. Later, Dan was charged with having molested his son, an allegation later found to be unsubstantiated. The trial court, the social workers, and Deanna's therapist were all concerned about her continued relationship with Dan in light of his similar child-rearing difficulties.

[8]Deanna's appeal from the order terminating reunification services was dismissed as "from an order which is not appealable. (Welfare and Institutions Code § 366.26 (k).)" We note, however, the notice of appeal was filed August 28, 1990, by trial counsel who was specifically advised this was the proper avenue of review by the referee and the record was prepared and filed before the order of dismissal was filed nine months later on April 12, 1991.

At the section 366.26 hearing, the court heard testimony from two social workers and Deanna's sister Debbie regarding Jeremy's adoptability and the termination of parental rights. The court found by clear and convincing evidence Jeremy was adoptable, ordered he remain with Denita and Barry in Texas, and terminated Deanna's parental rights.

ANALYSIS

*The Court Abused Its Discretion in Denying Deanna a Hearing on Her Section 388 Motion to Set Aside Its Earlier Order*

■ ▬ ■ ■ Deanna contends the court denied her due process when it summarily denied her a hearing on her section 388 request to set aside its August 7, 1990, order terminating reunification services and scheduled a section 366.26 hearing (to terminate parental rights).[9] The court denied the petition by checking a box on a printed form containing the statement, "It appears to the court that the best interests of the minor(s) will not be promoted by the proposed change of order." The court stated no factual reasons for its conclusion, nor did it recite any findings regarding the petition's significant allegations Deanna had abstained from substance abuse for more than one year, had continued therapy at her own expense and had exhibited no psychological impediment to her parenting ability, and evidence Jeremy desired to be with his mother. These allegations were submitted through declarations of Deanna, her mother and Dr. Amy Lamson, a certified clinical psychologist previously appointed by the court with whom Deanna continued to consult at her own expense.

■ We have previously determined section 388 is not facially unconstitutional, because it gives the court discretion whether to provide a hearing on a petition alleging changed circumstances. (*In re Heather P.* (1989) 209 Cal.App.3d 886, 891 [257 Cal.Rptr. 545].) However, in doing so, we noted there are safeguards to prevent arbitrariness in precluding such hearings. Specifically, a petition must be liberally construed in favor of its sufficiency

[9]The Department argues this court is without jurisdiction to consider Deanna's appeal of this matter. First, the Department asserts Deanna failed to apply for a rehearing pursuant to section 252. While this assertion is factually true, the language of section 252 does not state an application for rehearing must be brought under that statute before an appeal may be heard. Second, the Department points out Deanna's appeal is from the court's order of January 7, 1991, terminating her parental rights, and not from the January 4, 1991, denial of a section 388 hearing. In light of the circumstances where Deanna timely sought review in the manner explicitly advised by the juvenile court, we reject this technical argument.

In any event, the final judgment rule permits this court to review the denial of the motion for a section 388 hearing. (See also § 395.) While we believe writ review would ordinarily permit an earlier resolution of section 388 issues, the chronology of events here does not justify our refusing to consider this issue by way of an appeal.

(Cal. Rules of Court,[10] rule 1432(a)) and a hearing may be denied only if the application fails to reveal any change of circumstance or new evidence which might require a change of order. Only in this limited context may the court deny the petition ex parte. (Rule 1432(b).) In *In re Heather P.*, we stated: "Thus, if the petition presents any evidence that a hearing would promote the best interests of the child, the court will order the hearing." (209 Cal.App.3d at p. 891.)

 Indeed, to be entitled to a hearing on her petition, Deanna needed only to show "probable cause"; she was not required to establish a probability of prevailing on her petition. (*Ansley v. Superior Court* (1986) 185 Cal.App.3d 477, 490 [229 Cal.Rptr. 771].) In spite of the total lack of factual references to support the referee's check mark denial, we must presume he complied with the liberal analysis mandated by *In re Heather P.* and rule 1432(a). (Evid. Code, § 664.) Accordingly, we search the record to see if even a liberal interpretation of the proffered evidence of changed circumstances might not justify modifying the order terminating reunification.[11]

We begin by noting that by the time of the August 1990 hearing, the Department acknowledged Deanna had fully complied with almost all the court-ordered requirements. In particular, the social report submitted listed her progress in complying with the plan, as follows.

*Substance Abuse*—She consistently tested clean for "quite sometime," received drug counseling and attended Narcotics Anonymous meetings where she has a sponsor. She seemed no longer to be chemically dependent on illegal substances.

*Therapy and Treatment*—She received weekly therapy sessions for quite some time and has complied with these plan requirements.

*Parenting Education*—She completed a course.

*Visitation*—Four months earlier, Jeremy had his first four-day visit, during which Deanna became overwhelmed and depressed because of a fight with her boyfriend. Although, as stated earlier, Jeremy exhibited no emotional disturbance when he returned to the foster parent after this visit the

---

[10]All rule references are to the California Rules of Court.

[11]We express our concern with the check-off form 11/1990, although we recognize the expeditious impetus it provides to timely completing juvenile pendency litigation, a matter of no small concern to the process and to the best interests of the minors and parents involved. However, where, as here, the burden of evaluating facts is shifted to the appellate court with no guidance from the trier of fact, the additional appellate delay often exceeds the time initially saved.

report noted Deanna requested the next week's overnight visit be cancelled.[12]

*Housing*—Unsatisfactory in that she was temporarily living with friends and had established a relationship with a male.

*Conclusion*—She has "worked diligently on her reunification plan, but she has not been able to sustain the psychological stability necessary in order to parent this minor on a day-to-day basis." The only stated basis for this conclusion was the single episode of difficult visitation some six months before the hearing. It is noteworthy that this extended four-day visitation followed approximately seven months of satisfactory visitation, including overnight visits, and that satisfactory unsupervised visitation was again ongoing at the time of the hearing. Further, the court had received a "bonding" study concluding Jeremy was strongly bonded to his mother,[13] so strongly that the bonding evaluator, Dr. Kenneth Searcy, believed there would be a significant risk of harm to Jeremy if he were permanently separated from his mother. A court-appointed psychologist, Dr. Lamson, stated it was substantially probable Jeremy could be returned to Deanna's full physical custody within one month. Dr. Lamson was convinced Deanna had permanently severed her relationship with the man previously deemed inappropriate by the Department and who had triggered the unsatisfactory earlier visitation.

In his oral pronouncement, the referee found Deanna had complied with the reunification plan and was markedly improved. However, he found she had not "established an ability to provide a stable environment." This instability is the only stated basis for the court's finding there was a "substantial risk of detriment" should Jeremy be immediately returned to Deanna's custody. On this marginal basis, the referee concluded there was "not a substantial probability of return in six months," ordered termination of reunification efforts and scheduled a section 366.26 hearing.

Thus, as of the August section 366.21 order, the only stated basis for terminating reunification services was that exhibited by Deanna's lack of stable living accommodations. The three declarations accompanying Deanna's section 388 petition directly addressed this reputed deficiency in detail. In addition, Deanna's declaration emphasized her continuing abstention from drug and alcohol use, participation in Narcotics Anonymous and her continued therapy with Dr. Lamson at her own expense after court-ordered services

---

[12]With the exception of this one four-day visit, the record does not reveal any visitation was unsatisfactory. By the time of the hearing, visitations were again unsupervised.

[13]Indeed, that bond was still conceded to exist at the time of the hearing.

were terminated. Further, she declared she had maintained her own apartment since August 1990, which was adequate for her and Jeremy's needs, and that she had continued physical visitations with Jeremy even though he had been placed with her sister in Texas, and she phoned him at least twice a week. Deanna's mother, who resided in Oklahoma, stated she had visited with Jeremy approximately once every two weeks and verified Jeremy was still strongly bonded to Deanna and she to him. Both Deanna's mother and Dr. Lamson stated Deanna presently was able to provide suitable care for Jeremy. Significantly, Jeremy's grandmother stated he confided in her that he was just living with his aunt and uncle until he can return to his real mother with whom he wants to be reunited.

We conclude the uncontradicted declarations incorporated with Deanna's petition establish a strong prima facie showing of a favorable change in the single negative factor on which the referee purported to base his section 366.21 order, if not its complete elimination. On these facts, its summary denial without affording a hearing is not supported by the record. Indeed, the Department does not attempt to justify the denial of a hearing in response to Deanna's due process contention, referring instead to the court's generalized extensive discretion to determine the best interests of a minor. (*In re Eric B.* (1987) 189 Cal.App.3d 996, 1005 [235 Cal.Rptr. 22].) This general proposition is pertinent when a reviewing court applies its "abuse of discretion" standard when reviewing final determinations on the merits underlying a section 388 petition. However, the issue here is the right to procedural due process to permit a full and fair hearing on the merits. Case precedent in *In re Heather P.* and *Ansley* v. *Superior Court* only required Deanna to make a prima facie showing to trigger her right to proceed by way of a full hearing. This she has done and the court erred in its check mark denial of her petition.

In the chronology of these events, a fair hearing on the section 388 petition was a procedural predicate to proceeding to the section 366.26 hearing and disposition.[14] It is unfortunate that a year has transpired in processing this appeal, raising the specter of further residential disruption in Jeremy's life depending on the outcome of a current section 388 hearing. However, in this case where the Department supported its chosen adoptive placement on the basis that Deanna would continue to maintain regular and close contact with Jeremy in that setting, that concern is likely to be minimized.

More than three years have elapsed since Deanna began her attempts to regain Jeremy's physical custody, and more than a year has passed since she

---

[14]We see no reason why, under circumstances such as these, such matters could not be consolidated in time so long as the section 388 petition is decided first.

asserted these favorable changes of circumstances. Accordingly, the juvenile court shall schedule further hearings in accordance with this decision within a time framework sufficient to afford all parties reasonable opportunity to provide information showing Deanna's current parental stability as it relates to her fulfillment of the goals established by the reunification plan.[15] Should Deanna's petition be granted, a reasonable reunification plan should be established which will permit her access to Jeremy for reasonable visitations.

In the event the court finds Deanna has not met the burden imposed by section 388, it shall conduct a new section 366.26 hearing and make such orders as may be appropriate after evaluating relevant current information.

Judgment reversed. The matter is remanded for further proceedings consistent with this decision.

Benke, J., and Froehlich, J., concurred.

---

[15]Because the Department had conceded Deanna had complied with all visitation requirements, any lack of visitation attributable to the removal of Jeremy to Texas, or interference by the adoptive parents, shall not be considered against her.